Howard R. DeWITT, Appellee,

v.

Byron L. BROWN, M.D., Appellant.

No. 80–1950.

United States Court of Appeals,
Eighth Circuit.

Submitted Aug. 14, 1981.

Decided Jan. 6, 1982.

As Amended Jan. 27, 1982.

P. H. Hardin (argued), Hardin, Jesson & Dawson, Fort Smith, Ark., for appellee.

Richard B. Shaw (argued), Shaw & Ledbetter, Fort Smith, Ark., for appellant.

Before HENLEY and ARNOLD, Circuit Judges, and BECKER,* Senior District Judge.

WILLIAM H. BECKER, District Judge.

This is an appeal by appellant Dr. Byron L. Brown (Dr. Brown) from a judgment against him for $330,000.00 in favor of appellee Howard R. DeWitt (DeWitt) entered upon a jury verdict in the United States District Court for the Western District of

---

* The Honorable William H. Becker, United States Senior District Judge for the Western District of Missouri, sitting by designation.

Arkansas. [Designated Record, (R.), 118, 119].

The jury verdict was rendered in a civil action filed by DeWitt and Carole DeWitt (Mrs. DeWitt), husband and wife, in the District Court against Dr. Brown and the insurer of St. Edwards Mercy Medical Center (St. Edwards), to recover damages for injury to DeWitt and loss of consortium by Mrs. DeWitt alleged to have been caused by the negligent medical treatment of DeWitt by Dr. Brown and St. Edwards. (R. 1–5, 17–21).

### The Facts

Because the jury verdict was in favor of appellee DeWitt, the facts will be stated in the light of the evidence, and the reasonable inferences therefrom, most favorable to the appellee. *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, at 250 (C.A. 8 1978); *Raney v. Honeywell, Inc.*, 540 F.2d 932, at 934–935 (C.A. 8 1976); *Garoogian v. Medlock*, 592 F.2d 997, at 999–1000 (C.A. 8 1979).

On June 23, 1976, DeWitt, an employee of the Bedford Brothers cattle ranch, was preparing to confine to a pen and spray cattle. While so engaged, DeWitt attempted to rope a cow; the horse DeWitt was riding fell, and DeWitt's left leg was injured. At about 8:00 p. m. on June 23, DeWitt was taken to the emergency room at St. Edwards in Fort Smith, Arkansas where DeWitt was examined by Dr. Brown. Dr. Brown is an orthopedic surgeon practicing in Fort Smith, Arkansas who has not been board certified or board qualified in orthopedic surgery.

Dr. Brown diagnosed the injury as a "comminuted" (broken in several pieces) fracture of the fibula and the tibia bones of the lower left leg, and surgically attempted to reduce the fractures. Two transverse metal Steinmann pins were placed through the left leg, inserted in the tibia bone and incorporated in a "short" plaster cast which encased the lower left leg below the knee except for the toes.

An X-ray taken after the cast was applied showed an improper alignment of the bones, so Dr. Brown "circularized" the cast (cut the cast open around the leg), "wedged" the cast (spread the cast open at the front of the left leg at the point of "circularization"), corrected the alignment and repaired the cast.

At about 10:30 p. m. on June 23, DeWitt was moved from the operating room to a recovery room. DeWitt began complaining of substantial pain in his left leg at about 11:25 p. m. on June 23, and repeatedly complained of pain in his left leg during that night and the following morning of June 24. On June 24, Dr. Brown examined DeWitt at about 12:15 a. m. and at sometime between 8:00 a. m. and 9:30 a. m. and concluded that DeWitt's condition was satisfactory.

At about 8:00 a. m. on June 24, the toes of DeWitt's left foot had poor "toe wiggle", loss of sensation and were cool, puffy and blue. At about noon on June 24, the toes had poor movement and were cold, blue and very puffy.

Sometime between 10:00 and 11:00 a. m. on June 24, the visitors of DeWitt in his hospital room became worried about the condition of DeWitt's left leg and from about 10:00 a. m. or 11:00 a. m. to 2:00 p. m. on June 24 repeatedly requested that Dr. Brown be located by the staff of St. Edwards and that Dr. Brown examine DeWitt's left leg.

As a result, from about noon to 2:00 p. m. on June 24, Dr. Brown received two or three telephone calls in the emergency room at St. Edwards where he was attending another patient. By the telephone calls, Dr. Brown was informed that DeWitt was in pain; that a visitor of DeWitt was asking for Dr. Brown; that a visitor of DeWitt had attempted to alleviate the pain of DeWitt at about 2:00 p. m. by removing a 2 or 3 inch piece of cast from above the toes; and that the toes on DeWitt's left foot had become dark blue.

At about 2:00 p. m. or 2:30 p. m. on June 24, Dr. Brown returned to the hospital room of DeWitt, examined DeWitt's leg, saw that DeWitt's left foot and toes were swollen,

concluded that DeWitt had severe "cyanosis" (a dark blue color) of the toes caused by decreased circulation of oxygenated blood in and to the lower left leg, and attempted to alleviate this condition by splitting and spreading the cast open halfway up the front. Dr. Brown thought that the swelling and the color of the toes had then improved. Dr. Brown left DeWitt's hospital room, returned in about 30 minutes, concluded that the condition of the left leg was worse, split the cast completely open up the front and spread the cast as far as he could. Dr. Brown again thought that the color of the toes had improved. Dr. Brown left DeWitt's hospital room, returned in about 30 minutes, concluded that the condition was still unsatisfactory and removed a piece of the cast from each side of the leg. Thereafter on June 24 at examinations of the left leg at about 5:00 p. m., 9:00 p. m. and 11:30 p. m. Dr. Brown concluded that the condition of the left leg was "stable".

On the following morning, June 25, DeWitt was still in substantial pain. Thinking that the condition of his left leg was worse and following the advice of his employer, DeWitt decided to change doctors. His case was transferred to Dr. Alfred Hathcock (Dr. Hathcock), a specialist in orthopedic surgery from the Holt-Krock Clinic in Fort Smith, Arkansas.

Dr. Brown was notified of the intent of DeWitt to change doctors at about 8:00 a. m. on June 25, and attempted several times from about 9:00 a. m. to about 11:00 a. m. to discuss the condition of DeWitt's left leg with a doctor from the Holt-Krock Clinic. Dr. Brown discussed the matter with Dr. Hathcock by telephone at about 11:00 a. m. on June 25.

Dr. Hathcock first examined DeWitt at about 2:00 p. m. on June 25. Dr. Hathcock concluded that DeWitt might have some "circulatory embarrassment" (poor circulation of blood) to his left foot, transferred DeWitt to an operating room, removed the cast and Steinmann pins and ordered an "arteriogram" which showed that the circulation to the lower left leg was obstructed. Dr. Hathcock diagnosed the condition as a "compartment syndrome" and performed a "fasciotomy" which immediately restored the circulation.

DeWitt was released from St. Edwards on July 31, 1976. His left leg was in a cast until December 1976, and thereafter in a leg brace for about six months. DeWitt returned to his former position of employment at Bedford Brothers at about a year after his release from St. Edwards. Since then DeWitt has daily pain in his left leg and recurring muscle spasms in his left calf; he has numerous scars on his left leg, and an unhealed pressure sore on his left heel; he has a claw toe deformity (drawn toes) of the left foot and walks with a "drop foot gait" ("slaps" or "flops" his left foot); he has diminished size, sensation, temperature and strength in his left leg; he has "paresthesia" (a tingling sensation) of the lower left leg; he has diminished range of motion of the left ankle; and the permanent impairment to his lower left leg has been estimated at 45% to 100%.

At the time of his trial, DeWitt had incurred medical expenses for the past treatment of his injuries in the amount of $9,587.80; he was 29 years old and had a life expectancy of 41 years; he was married and had a daughter who was 7 years old; he had a high school education; and his only work experience had been in working with livestock, building fences and other manual type labor. At the time of his trial, DeWitt was employed by Bedford Brothers, and his salary was $800.00 a month. The Bedford brothers are DeWitt's father-in-law and the brother of DeWitt's father-in-law. DeWitt has been unable to perform his duties at work to the extent he performed them prior to the injury; and because of the damage to the left leg, DeWitt is not hireable as a ranch hand in the cattle business by others than Bedford Brothers.

### The Complaint, Amended Complaint, Answer And Counterclaim

On January 18, 1978, DeWitt and Mrs. DeWitt filed a civil action in the United States District Court for the Western District of Arkansas against Aetna Casualty

and Surety Company (Aetna). (R. 1). Their complaint alleged that the negligence of St. Edwards, "its servants, agents and employees" caused injury to DeWitt and loss of consortium by Mrs. DeWitt; that St. Edwards was insured by Aetna for liability resulting from injury to the patients of St. Edwards; and that Aetna was, therefore, directly liable to DeWitt and Mrs. DeWitt for damages. (R. 1–5).

On June 23, 1978, the complaint was amended to join Dr. Brown as a defendant and to allege that the injury to DeWitt and the loss of consortium by Mrs. DeWitt were caused by the negligent medical treatment of DeWitt by Dr. Brown. (R. 17–21). By Answer, Dr. Brown denied the allegations in the complaint, and in a counterclaim alleged that he was owed $270.00 in medical bills unpaid by DeWitt. (R. 23–24).

### The Trial, Verdicts and Judgment

A jury trial was commenced on September 3, 1980. At the conclusion of the plaintiffs' case, the District Court directed a verdict for Aetna and against DeWitt and Mrs. DeWitt (Transcript, (Tr), 703, 709–710; R. 111), and by Order entered September 5, 1980, ordered and adjudged that DeWitt and Mrs. DeWitt recover nothing from Aetna and that their complaint against Aetna be dismissed (R. 117).

At the conclusion of the trial, the jury rendered a verdict in favor of DeWitt and against Dr. Brown and fixed DeWitt's damages at $330,000.00 (Tr. 1179; R. 115), and rendered a verdict in favor of Dr. Brown and against Mrs. DeWitt (Tr. 1179; R. 116). The District Court entered judgment upon the jury verdicts, and ordered and adjudged that Mrs. DeWitt recover nothing from Dr. Brown, and that DeWitt recover damages from Dr. Brown in "the sum of $330,000.00, and that said sum shall bear interest at the rate of ten (10) percent per annum from [that] date until paid." (R. 118).

### The Contentions On Appeal

On appeal, appellant Dr. Brown contends (1) that the District Court erred in refusing to exclude the testimony of Dr. Ernest H. Neighbor (Dr. Neighbor), an expert witness for the plaintiffs; (2) that there is no substantial evidence that the alleged negligence of Dr. Brown was the proximate cause of DeWitt's damages; and (3) that the jury verdict in the amount of $330,-000.00 is excessive. (Brief for Appellant 5, 11, 14).

In opposition, appellee DeWitt contends (1) that the District Court, in the exercise of its discretion, did not err in permitting Dr. Neighbor to testify; (2) that there is substantial evidence that the alleged negligence of Dr. Brown was the proximate cause of DeWitt's damages; and (3) that the contention by appellant that the jury verdict is excessive was not preserved for appellate review or, in the alternative, that the jury verdict is not excessive. (Brief of Appellee 1, 10, 23, 27).

### Decisions On Appeal

We conclude that there is no error in the rulings of the District Court and that the judgment in favor of appellee DeWitt should be affirmed.

### I.

### The District Court Did Not Err In Admitting The Testimony Of Dr. Neighbor, An Expert Witness For The Plaintiffs

■ In this federal civil action, jurisdiction is based on diversity of citizenship and the presence of the required jurisdictional amount. Therefore, the law of Arkansas governs the standard of care required of Dr. Brown during his treatment of DeWitt. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Jeanes v. Milner*, 428 F.2d 598, at 601 (C.A. 8 1970). Under Arkansas law, expert testimony is required when the applicable standard of care is not within the common knowledge of the jury. *Jeanes v. Milner, supra*, 428 F.2d at 601 (C.A. 8 1970) and cases therein cited. *Cf. Davis v. Kemp*, 252 Ark. 925, 481 S.W.2d 712, at 712–713 (1972). And under Arkansas law, a physician or surgeon is held only to the standard of care or competency that exists in his own

locality or in a similar locality. *White v. Mitchell*, 263 Ark. 787, 568 S.W.2d 216, at 219 (1978); *Gambill v. Stroud*, 258 Ark. 766, 531 S.W.2d 945 (1976); *Jeanes v. Milner, supra*, 428 F.2d at 601 (C.A. 8 1970).

In the District Court, on this subject, the plaintiffs introduced the testimony of Dr. Neighbor. Dr. Neighbor is a board certified orthopedic surgeon practicing in Kansas City, Missouri, and in Pittsburg, Kansas. He is a member of the American Academy of Orthopedic Surgeons, the Mid-Central States Orthopedic Society and the Kansas Orthopedic Society.

Appellant contends that the District Court erred in admitting the testimony of Dr. Neighbor for the reason that no appropriate foundation was laid to establish that Dr. Neighbor was familiar with the standard of care required of an orthopedic surgeon in Fort Smith, Arkansas or in a locality similar to Fort Smith, Arkansas.

Appellant admits that the similarity of localities is an issue subject to proof. (Brief for Appellant 10). Further, in *Gambill v. Stroud, supra*, 258 Ark. 766, 531 S.W.2d at 949–950 (1976), the Supreme Court of Arkansas stated:

> One of the ideas suggested in appellants' argument is that a national standard of care should be observed. This is also unrealistic. We cannot accept that premise as a matter of law and we certainly do not take the theory that such a standard exists to be so well established that it can be judicially noticed. If it does factually exist to any extent, or in any case, then certainly it can be shown by evidence. If the medical profession recognizes that there are standard treatments, which should be utilized nationwide this fact should be readily suspectible of proof under the similar locality rule, because the skill and learning should be the same and all localities would be similar.
>
> \* \* \* \* \* \*
>
> [T]he similar locality rule is not necessarily so restrictive, and an expert witness need not be one who has practiced in the particular locality or who is intimately

familiar with the practice in it in order to be competent to testify if the appropriate foundation has been laid to show that he is familiar with the standards of practice in a similar locality, either by his testimony or by other evidence showing the similarity of localities.

Appellant contends, however, that there was no proof (1) that there is a national standard of care for orthopedic surgeons or (2) that Dr. Neighbor was familiar with the standard of care of an orthopedic surgeon in Fort Smith, Arkansas or in a similar locality.

This contention is refuted by the evidence. Dr. Hathcock, a practicing orthopedic surgeon in Fort Smith, Arkansas, testified as follows (Tr. 366–367):

Q. Uh, actually, I'll ask you doctor, if Fort Smith is not kind of the hub of medicine for an area that probably has a radius of seventy five miles any direction.

A. Well, I hope that's true.

Q. And actually the—the orthopedic surgeons in this area have set and maintained a very high standard of practice in orthopedics, have they not?

A. Hopefully.

Q. Uh, actually the standard of practice for orthopedic surgery is national in its scope, isn't it?

A. Yes sir.

Q. And in other words, you would expect that here you would find the same standard of practice of orthopedic surgery as you'd find anywhere else in the United States.

A. Yes sir.

Q. Our doctors have the same facilities available to them, the same medical literature, the same cast materials, pins, x-rays, that you'd find in most standard hospitals across the country. Do they not?

A. Yes sir.

Dr. Neighbor, called as an expert witness for appellee DeWitt, testified as follows (Tr. 511–512):

Q. Now Doctor, are you familiar with the standard of care that is practiced by orthopedic specialists over the country?

A. Yes indeed, I am.

Q. Is there a national standard that's generally recognized by orthopedic surgeons such as yourself?

A. I believe there is, yes sir.

* * * * * *

Q. Are you also Doctor, acquainted with the degree of learning and skill ordinarily possessed by and used by members of the medical profession specializing in the practice of orthopedics?

A. Yes I am.

Q. And if we assume Doctor, that the standard of care, and the degree of learning and skill .ordinarily possessed by orthopedic surgeons is the same in Fort Smith as it is nationally, then would you know what the standard is in Fort Smith?

A. Yes I would.

For the purposes of this appeal, this testimony supports the finding of the existence of a national standard of care for the practice of orthopedic surgery that is observed in the Fort Smith, Arkansas area.

■ The "[a]dmission or exclusion of expert testimony is a matter within the sound judicial discretion of the trial court, and the trial court's decision should not be reversed unless found to be 'manifestly erroneous.'" *Soo Line Railroad Co. v. Fruehauf Corp.*, 547 F.2d 1365, at 1374 (C.A. 8 1977) and cases therein cited. And "the prevailing standard is that a trial judge's determination of the qualifications of a witness is conclusive unless shown to be an abuse of judicial discretion or a clear error of law." *Soo Line Railroad Co. v. Fruehauf Corp.*, supra, 547 F.2d at 1374 (C.A. 8 1977) and cases therein cited. There was no abuse of discretion in this case. Further, if the jury may find that the witness was not qualified in reaching its verdict, that did not occur in this case. Applying these standards, we conclude that the testimony of Dr. Neigh-

bor, on the standards of care applying to orthopedic surgery in the Fort Smith area, was properly admitted.

■ In his reply brief, appellant also contends that the District Court erred in allowing the jury to determine the qualification and competence of Dr. Neighbor as an expert witness. In support of this contention, the appellant quotes the following statement made by the District Court when ruling on the admissibility of Dr. Neighbor's testimony (Tr. 512):

All right. Note the objection. I'm—I'm going to overrule it. It'll be for the jury to give weight and credit to the doctor's testimony because he has stated that his qualifications, I'm going to consider that he's an expert and that . . . it will be for the jury to consider whether or not he is familiar with the degree of skill and learning ordinarily possessed and used by members of the profession in good standing engaged in the same type of practice or speciality in the locality, either where he practices or in a similar locality of that of Fort Smith.

We conclude that appellant's contention is rendered moot by later instructions of the District Court. After *voir dire* examination of Dr. Neighbor by defense counsel on the qualifications of Dr. Neighbor as an expert witness, the District Court instructed the jury as follows (Tr. 515):

Ladies and Gentlemen of the jury, it's the Court's ruling that the witness is entitled to testify. Weight and credit will be determined by you the jury.

At the conclusion of the trial, the District Court instructed the jury as follows (Tr. 1142–1143):

You the jury should consider each such expert opinion received in evidence in this case, and give it such weight as you may think that it deserves. If you the jury should decide that the opinion of an expert witness is not based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evi-

dence, you may disregard the so-called expert opinion entirely.

Because the jury was correctly instructed when all instructions of the District Court are considered, we conclude that the District Court did not err in admitting the testimony of Dr. Neighbor.

## II.

*There Is Substantial Evidence That The Alleged Negligence Of Dr. Brown Was The Proximate Cause Of The Damages Awarded To DeWitt*

Appellant contends that there was no substantial evidence that the alleged negligence of Dr. Brown was the proximate cause of the damages awarded to appellee DeWitt. In testing the sufficiency of the evidence to support a jury verdict in a diversity action, this Court has held that "where state and federal tests for sufficiency of the evidence are similar and neither party has raised the issue, we would look to state law as controlling." *Garoogian v. Medlock*, 592 F.2d 997, at 999 n.3 (C.A. 8 1979); *Gisriel v. Uniroyal, Inc.*, 517 F.2d 699, at 701 n.6 (C.A. 8 1975) and cases therein cited.

■■ Under Arkansas law, a "reviewing court is bound to examine the evidence in the light most favorable to the appellee . . . and bound to sustain the jury verdict if there is any substantial evidence to support it." *Garoogian v. Medlock, supra*, 592 F.2d at 999–1000 (C.A. 8 1979) and cases therein cited. *Cf. White v. Mitchell, supra*, 263 Ark. 787, 568 S.W.2d at 221 (1978) and cases therein cited. This Court has held that the test under the law of Arkansas for the sufficiency of the evidence is similar to the federal test. *Garoogian v. Medlock, supra*, 592 F.2d at 999 n.3 (C.A. 8 1979); *Gisriel v. Uniroyal, Inc., supra*, 517 F.2d at 701 n.6 (C.A. 8 1975). Under the federal test, "a jury verdict will be sustained so long as there is 'substantial evidence' or a 'reasonable basis in fact' for the jury's conclusion." *Gisriel v. Uniroyal, Inc., supra*, 517 F.2d at 701 n.6 (C.A. 8 1975) and cases therein cited. "An appellate court may not substitute its view of the facts for that of the trier of

fact unless it is in a position to hold that reasonable minds, viewing the evidence in the light most favorable to the prevailing party, could only have found otherwise than the trier of fact." *McIntyre v. Everest & Jennings, Inc.*, 575 F.2d 155, at 158 (C.A. 8 1978), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978) and cases therein cited.

■ Appellant's contention that there is no substantial evidence of causation is not supported by the evidence under either the applicable federal law or the law of Arkansas. There is substantial evidence in the record to support a finding by the jury of proximate cause including, but not limited to, the testimony that Dr. Brown knew, and should have known, early in his treatment, that a "compartment syndrome" could develop in DeWitt's lower left leg; and that a "compartment syndrome" can cause irreversible damage or death to leg tissue if improperly diagnosed or treated.

Furthermore, there is direct expert testimony supporting a finding by the jury of proximate cause. Dr. Neighbor testified as follows (Tr. 515–516):

Q. All right. Do you have an opinion in other words, as to whether Dr. Brown uh, failed to apply the degree of skill and learning ordinarily possessed and used by the members of the medical profession specializing in orthopedic surgery?

A. Yes sir, I have an opinion.

Q. And what is that opinion?

A. It is my opinion that Dr. Brown deviated from the level of competence uh, required in the standard of care in his treatment of Mr. DeWitt, and *that that deviation from the standard practice caused damages and injury to Mr. DeWitt.* (Emphasis added.)

Dr. Neighbor further testified as follows (Tr. 546):

Q. Now doctor, I'll ask you sir, *whether as a result of your examination of Mr. DeWitt, you found that he suffers any disability as a result of the*

*negligence of Dr. Brown that you have testified about?*

A. *Yes.*

Q. And tell the jury the nature of that disability sir.

A. He has a weakness of the muscles in his lower leg. He has a loss of motion of the ankle, left ankle. He has clawing of his toes and he has skin lesions on the back of the calf and the back of the heel.

Q. And do you consider those conditions permanent in nature?

A. Yes, yes I do.

Q. You think—he'll suffer from the rest of his life.

A. Yes. (Emphasis added.)

Therefore, there is sufficient evidence in the record to support a jury finding of proximate cause.

### III.

*The Jury Verdict Is Not Excessive*

 Appellant contends that the jury verdict in the amount of $330,000.00 is excessive. In the absence of exceptional circumstances, not present in this case, the issue of the excessiveness of a jury verdict must be presented first to the District Court in a motion for a new trial in order to preserve the issue for appellate review. *Calcagni v. Hudson Waterways Corp.*, 603 F.2d 1049, at 1051–1052 (C.A. 2 1979); *Ryen v. Owens*, 446 F.2d 1333, at 1334–1335 (C.A. D.C.1971); *Baker v. Dillon*, 389 F.2d 57, at 58 (C.A. 5 1968); 6A *Moore's Federal Practice*, ¶ 59.08[6] n.64a, ¶ 59.14 n.10, ¶ 59.15[3] n.10; 11 Wright & Miller, *Federal Practice and Procedure: Civil*, § 2818, n.36. This Court has stated,

> [I]n our opinion, inadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders.

*Richardson v. Communications Workers of America*, 530 F.2d 126, at 129 (C.A. 8 1976), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976) quoting Judge Blackmun, now Justice Blackmun, in *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, at 447–448 (C.A. 8 1961), *cert. denied*, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961). Because the issue of the excessiveness of the jury verdict was not presented to the District Court, there is no basis for appellate review in the circumstances of this case. Therefore, the contention that the judgment of the District Court should be reversed because the verdict is excessive is denied.

Furthermore, if the issue were properly preserved for appellate review, we conclude that, viewing the evidence in the light most favorable to the appellee, the jury verdict is not excessive. In a diversity action, "the standard of review with respect to a motion for a new trial on the basis of excessive damages is determined by federal law." *Nodak Oil Co. v. Mobil Oil Corp.*, 533 F.2d 401, at 410 (C.A. 8 1976) and cases therein cited. Under federal law, "[i]f the verdict is to be overturned because of its size, it must be so large as to shock the judicial conscience." *Flanigan v. Burlington Northern Inc.*, 632 F.2d 880, at 884 (C.A. 8 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981) and cases therein cited. And in order to find that the jury verdict is excessive, this Court must conclude that there is "plain injustice" or a "monstrous" or "shocking" result. *Iowa-Mo Enterprises, Inc. v. Avren*, 639 F.2d 443, at 452 (C.A. 8 1981); *Steinmetz v. Bradbury Co., Inc.*, 618 F.2d 21, at 23 (C.A. 8 1980); *Nodak Oil Co. v. Mobil Oil Corp., supra*, 533 F.2d at 410–411 (C.A. 8 1976) and cases therein cited.

While the federal standard of review is applicable, under federal law this Court must also "look to the forum state's case law for guidance on the question of excessiveness." *Stineman v. Fontbonne College*, 664 F.2d 1082, at 1089 (C.A. 8 1981). The result that would be reached under the law of Arkansas is one factor to be considered

by this Court in determining whether the jury verdict is excessive. *Nodak Oil Co. v. Mobil Oil Corp., supra,* 533 F.2d at 411 (C.A. 8 1976); *Novak v. Gramm,* 469 F.2d 430, at 434–435 (C.A. 8 1972). Under the law of Arkansas, the standard of review is "whether the amount shocks the conscience of the court or demonstrates that the jurors were motivated by passion, prejudice or undue influence." *White v. Mitchell, supra,* 263 Ark. 787, 568 S.W.2d at 224 (1978). And this Court "must give the evidence in favor of the verdict its highest probative force and then determine whether there is any substantial evidence to sustain the verdict." *White v. Mitchell, supra,* 263 Ark. 787, 568 S.W.2d at 225 (1978) and cases therein cited.

Under either the federal law or the law of Arkansas, the evidence, viewed in the light most favorable to appellee, is sufficient to support a jury verdict in the amount of $330,000.00. Further, as stated above, the trial court was never moved to review the question of excessiveness and therefore cannot be held to have abused its discretion.

For the foregoing reasons, the judgment of the District Court is affirmed.