Cindy GRICE and Bill Grice, Her Husband *v.* Robbie R. ATKINSON, D.D.S., M.D.

91-174                                      826 S.W.2d 810

Supreme Court of Arkansas
Opinion delivered March 23, 1992

638

*Bill R. Holloway*, for appellants.

*Friday, Eldredge & Clark*, by: *C. Tab Turner* and *Guy Alton Wade*, for appellee.

STEELE HAYS, Justice. This is an appeal from a judgment entered by the trial court in a dental malpractice action following a directed verdict for the defendant at the close of the plaintiffs' case.

Cindy Grice and her husband sued Dr. Robbie R. Atkinson for failure to give Mrs. Grice the type of information customarily given to patients by other members of the dental profession in securing an adequate, informed consent to the performance of oral surgery. The trial judge granted the motion for a directed verdict on the premise the plaintiffs had failed to establish that the defendant did not supply the type of information given by other dentists in the same or a similar locality as that of the defendant. Finding no error we affirm the judgment.

When x-ray photographs revealed that third molars, or wisdom teeth, were threatening other teeth, Mrs. Grice was referred by her family dentist to Dr. Atkinson, a Pine Bluff oral

surgeon. Dr. Atkinson reviewed x-ray films and explained to Mrs. Grice that a wisdom tooth on the lower right was growing into the roots of permanent jaw teeth. He advised removal by oral surgery, Mrs. Grice testified that Dr. Atkinson did not discuss the surgical procedure with her and did not tell her that her tongue might be permanently numb as a result of the surgery.

On June 10, 1986, when Mrs. Grice appeared at Dr. Atkinson's office for the scheduled surgery, she was instructed by the receptionist to sign some papers. The receptionist explained that one was an insurance form and one was a consent form giving the doctor permission to work on her. Mrs. Grice signed the forms without reading them. The consent form reads in part:

> I, Cindy Grice request that Dr. Atkinson perform surgery to remove three (3) third (3rd) molars. . . . I understand the hazards in connection with these procedures such as swelling; hematoma or discoloration; infection; nerve damage; numbness of lips, face or tongue; loss or damage to other teeth. . . .

She then went to the operating room where Dr. Atkinson administered an injection to deaden her jaw. Following the removal of the tooth she went home and by the afternoon feeling had returned except for the right side of her tongue, which remained desensitized. She reported this to Dr. Atkinson the next day and was advised to come in if the numbness persisted beyond a week. When she came in as instructed Dr. Atkinson confirmed the numbness by pricking her tongue with a needle. Dr. Atkinson told Mrs. Grice to come back in nine months.

Mrs. Grice contends she has never regained the feeling in her tongue, which feels thick all the time. She has no taste on the right side of her mouth and her saliva glands do not work properly. Speech is difficult and she has trouble eating. She bites her tongue and often burns the roof of her mouth or the opposite side of her mouth from hot foods and liquids.

In determining the propriety of a directed verdict we give the evidence its strongest probative weight favorable to the appellant, drawing all inferences reasonably consistent therewith. *Grain Dealers Mutual Insurance Co.* v. *Porterfield*, 287 Ark. 27, 695 S.W.2d 833 (1985).

The deposition of Dr. Anthony Michael Captline was introduced on behalf of the Grices. Dr. Captline testified that he was board certified in 1974 as an oral and maxillofacial surgeon, limiting his practice to oral surgery. His credentials in the field of oral surgery are extensive. He said Mrs. Grice was referred by Dr. Martin for the removal of three third molars, one of which was in a vertical position with the crown angled toward the front of the mouth. He theorized the only reason Dr. Martin would want the tooth removed would be on a prophylactic, or preventative basis, "in other words, elective surgery." Dr. Captline advised telling patients the risks before they sign a consent, which he considered inadequate if it lacks a complete description of the nature of the numbness that may occur. Quoting from his deposition:

> (T. 234-235). My biggest complaint in regards to Dr. Atkinson is the consent to sign by Mrs. Grice. I feel that the consent to sign is not adequate in that it lacks a complete description of the nature of the numbness that may occur, specifically, in this case to the lingual nerve being temporal or permanent in nature. I believe that information is necessary for a person of ordinary intelligence and awareness to know the risks or hazards inherent in this surgery. I believe that information should be given to a patient that is going to undergo elective surgery. I believe a person of ordinary intelligence and awareness in a position similar to Mrs. Grice's should be given information so that she could reasonably be expected to know the risk or hazard inherent in the surgery that Dr. Atkinson was going to perform.

When the plaintiffs rested their case in chief the defense moved for a directed verdict on the ground that Mrs. Grice admitted signing the form without reading it and that Dr. Captline's testimony did not establish familarity with the type of information given to a patient in Pine Bluff or similar localities. The motion was granted.

We have addressed the similar locality rule in several cases. In *Gambill* v. *Stroud*, 258 Ark. 767, 531 S.W.2d 945 (1975), we wrote:

> The rule we have established is not a strict locality rule. It incorporates the similar community into the picture. The standard is not limited to that of a particular locality.

Rather, it is that of persons engaged in a similar practice in similar localities, giving consideration to geographical location, size and character of the community. The similarity of communities should depend not on population or area in a medical malpractice case, but rather upon their similarity from the standpoint of medical facilities, practices and advantages. For example, appellants state in their brief that it was uncontroverted that the medical standards of practice in Jonesboro, Little Rock, and Memphis are comparable. Thus, they could be considered similar localities. The extent of the locality and the similarity of localities are certainly matters subject to proof. Modern means of transportation and communication have extended boundaries but they have not eliminated them. The opportunities available to practitioners in a community are certainly matters of fact and not law and may be shown by evidence under our own locality rule.

(Citations omitted.)

Later, in *White* v. *Mitchell*, 263 Ark. 787, 568 S.W.2d 216 (1978), the similarity rule was examined from a slightly different angle. There, the plaintiff's medical expert, an orthopedic surgeon, was challenged on the ground that he was not familiar with the practice of medicine by a general practitioner in Malvern, Arkansas, and hence, not a competent witness. Citing *Gambill* v. *Stroud, supra,* we said that an expert witness need not be one who has practiced in the particular locality, or one who is intimately familiar with the practice in it in order to be qualified as an expert to testify in a medical malpractice action, "if an appropriate foundation is established to demonstrate that the witness is familiar with the standard of practice in a similar locality, either by his testimony or by other evidence showing the similarity of localities."

More recently, in *Fuller, Adm'x* v. *Starnes*, 268 Ark. 476, 597 S.W.2d 88 (1980), we discussed in some depth the divergent views of American courts concerning the degree of disclosure necessary to render a consent adequate and informed so as to bind the patient:

Although the existence of a physician's duty to warn a patient of hazards of future medical treatment is generally

recognized, a wide divergence of views has developed concerning the appropriate standard for measuring the scope of the duty. The minority view is that the duty of a physician to disclose is measured by the patient's need for information material to the patient's right to decide whether to accept or reject the proposed medical treatment. Emphasizing the right of the patient to control what happens to his body, the minority view is undergirded by the proposition that what a patient should be told about future medical treatment is primarily a human judgment. The majority view is that the duty of a physician to disclose is measured by the customary disclosure practices of physicians in the community or in a similar community. This view emphasizes the interest of the medical profession to be relatively free from vexatious and costly litigation and holds that what a patient should be told about future medical treatment is primarily a medical decision.

(Citations omitted.)

■ In *Fuller*, this court chose the majority view, influenced by the contemporaneous adoption of that position by the enactment by the Arkansas General Assembly of Act 709 of 1979, codified as Ark. Code Ann. § 16-114-206(b)(1) (1987), which places on the plaintiff the burden of proving that the physician failed to supply the type of adequate information regarding the surgery as would have been given by other physicians in the same, or in a similar, locality.

In affirming the trial court, we are not overlooking Dr. Captline's avowal that he was "familiar with the information which must be given to a patient in order to have informed consent in Pine Bluff, Arkansas, or a similar locality." However, support for that single, conclusory assertion is not found in his testimony, at least as abstracted. Nor was there any attempt to compare the locale of Dr. Captline's practice to that of Dr. Atkinson's. We are not told the size, character or availability of facilities of the community where Dr. Captline practices. Indeed, his testimony does not even identify the location of his practice. There is no attempt to compare the similarity of medical/dental facilities, practices and advantages available in Pine Bluff with those existing in comparable localities with which Dr. Captline is

familiar. In fact, when asked on cross-examination if he knew the common practice of oral surgeons in Arkansas with respect to consent forms, Dr. Captline answered: "I do not know what they commonly do."

■ We must agree with appellee, as did the trial judge, that while our rule is not stringent, it requires more than was provided in this case. When the testimony of Dr. Captline is given its fullest weight it lacks that essential constituent of proof required by § 16-114-206(b)(1) and we cannot say the trial court ruled incorrectly.

Affirmed.