FIRST COMMERCIAL TRUST COMPANY, Substitute Administrator of the Estate of Laura Allison Fullbright, Deceased *v.* Joseph John RANK, Mary Ellen Robbins, and Rheeta Stecker, M.D.

95-518                                             915 S.W.2d 262

Supreme Court of Arkansas
Opinion delivered February 12, 1996
[Supplemental Opinion on Denial of Rehearing delivered March 18, 1996.]

*Gary Eubanks & Associates*, by: *James Gerard Schulze* and *William Gary Holt*, for appellant/cross-appellee.

*D. Scott Hickam*, for appellees/cross-appellants Joseph John Rank and Mary Ellen Robbins.

*Friday, Eldredge & Clark*, by: *Tonia P. Jones*, for appellee/cross-appellant Rheeta Stecker.

ROBERT L. BROWN, Justice. The appellant, First Commercial Trust Company, Administrator of the Estate of Laura Fullbright, appeals from a judgment in favor of appellee Dr. Rheeta Stecker, who was the family doctor for Laura Fullbright and her mother, Mary Ellen Robbins. The Administrator asserts that the trial court abused its discretion in refusing to allow a medical expert, Dr. Frederick Epstein, to testify with respect to the standard of medical care regarding child abuse in Hot Springs. We agree that this was error, and we reverse the judgment in favor of Dr. Stecker and remand the matter for a new trial on the medical negligence count. We affirm the judgment in favor of Dr. Stecker on the count relating to failure to report under the child abuse reporting statute, and we hold that the refusal of the trial court to direct a verdict on this count in favor of the Administrator was not error.

On June 12, 1992, Mary Ellen Robbins took her 12 1/2-

month-old baby, Laura Fullbright, to Dr. Rheeta Stecker for a "well-baby checkup." Robbins was a pharmacist and had been a patient herself of Dr. Stecker's for approximately five years. Dr. Stecker referred to her as a "colleague." During that checkup, Dr. Stecker noticed that Laura's forearm was angulated and swollen, but upon checking, she determined that it was not tender and there was no bruising. An X-ray showed that there was a fracture to both of the bones of the lower left arm. Robbins and her boyfriend, Joe Rank, stated that they did not know what had caused the fractures. Dr. Stecker then referred Robbins to Dr. Robert Olive, an orthopedic surgeon, to assure that the bone would heal properly. At that time, Dr. Stecker believed that there was a possibility the child had been neglected, and that belief was communicated to Dr. Olive. After treating Laura, Dr. Olive stated in a letter to Dr. Stecker that the bones would heal nicely and that there did not appear to be any evidence of neglect.

On July 9, 1992, Robbins visited Dr. Stecker's office again. During that visit, Robbins complained that Laura was "wobbly" and unbalanced. Dr. Stecker did not find any signs of head trauma. Dr. Stecker decided that Robbins had given Laura too much juice. Because Laura had been on multiple antibiotics frequently for a chronic ear infection, Dr. Stecker opined that there might be an overabundance of yeast in her stomach, causing her to become intoxicated.

On July 21, 1992, Robbins returned with Laura again. Dr. Stecker was not there, but her husband, Dr. Elton Stecker, was present and treated Laura. Dr. Elton Stecker's records state that Laura had been nauseated the previous day and had vomited that morning. When the child awoke, there was swelling on the right side of the head in the temple area and over the right eye. Robbins told Dr. Elton Stecker that the bruise above the right ear was caused by a fall the week before.

The next morning, on July 22, 1992, Robbins made two phone calls to the Stecker clinic. In the first of those calls, she stated that she believed Laura was having an allergic reaction and that the swelling over the right eye had gone down but that the other eye had become swollen. Later on that morning, Robbins called and stated that both eyes seemed to be swollen and

that Laura was running a temperature of approximately 99.5 degrees. She was told by the nurse to bring Laura in.

When Laura was brought into the clinic, Dr. Rheeta Stecker examined her. Prior to this examination, she referred to the notes taken by her husband the previous day. Both of Laura's eyes now appeared to be swollen, and there was some purplish discoloration. Robbins informed Dr. Stecker that the child had fallen down several stairs the week before and that several of the bruises were related to that fall. Robbins asked if the swelling of the upper lids could be related to allergies or to spider bites. Robbins told her that Laura had had a watery nasal discharge for the last few days which she thought was due to an allergy. At that point, Dr. Stecker discussed the possibility of abuse with Robbins. Robbins informed her that it was highly unlikely, but that her son, Matthew, might have dropped Laura. She further stated that her boyfriend, Joe Rank, was not the type to have a bad temper. Dr. Stecker did not report her suspicions to the Arkansas Department of Human Services.

On September 12, 1992, Robbins was working and left Laura with Joe Rank. When she returned Rank informed her that Laura was taking a nap and that she had fallen down in the driveway. When Robbins went to wake Laura from her nap, she found Laura lying in bed and moving her head from side to side. When she took a closer look, she saw what appeared to be either juice or blood draining from the corner of her mouth. When she picked Laura up, the child was limp. She immediately took Laura to St. Joseph's Regional Health Center in Hot Springs. At St. Joseph's, Laura was not breathing and did not have a pulse. She was transported to Arkansas Children's Hospital in Little Rock where she was later pronounced dead.

The medical examiner, Dr. William Sturner, determined that the cause of death was homicide. He found four bruises on the child's scalp and bruises on her left hand and arm. He also found abraded contusions on the mid-chest of the body and on the face, forehead, the right eyebrow, and the right cheek. The most significant injury, he concluded, was a fracture to the child's skull, with corresponding brain damage. Dr. Sturner opined that those injuries would have had to have been caused by a marked or severe force.

Suit was commenced on behalf of Laura's estate. The suit alleged that Joe Rank intentionally assaulted Laura Fullbright and that her mother, Mary Ellen Robbins, negligently placed Laura in the care of Rank with the knowledge of his past abusive behavior. Medical negligence was alleged against Dr. Rheeta Stecker in addition to her failure to report her suspicions of child abuse under the child abuse reporting statute. Prior to trial, Dr. Stecker moved twice for summary judgment on the basis that the alleged actions on her part were not violative of the child abuse reporting statute. The second motion included a prayer for summary judgment on the medical malpractice claim against her. The trial court denied the motions.

The case went to trial, and the trial court, at the conclusion of the plaintiff's case, granted a partial directed verdict in favor of Rheeta Stecker on the issue of medical malpractice after refusing to allow the plaintiff's expert, Dr. Frederick Epstein, to testify as to the standard of medical care concerning child abuse in Hot Springs. The case proceeded on the remaining issues, and the jury returned a verdict against Joe Rank in favor of Matthew Robbins, Laura's half-brother, in the amount of $1,000,000. The jury found in favor of Mary Ellen Robbins and Dr. Rheeta Stecker on the remaining failure to report count. Judgment was entered accordingly.

## I. Medical Expert Witness

The Administrator's first argument is the trial court erred in excluding the testimony of Dr. Frederick Epstein on the standard of care for diagnosing child abuse in Hot Springs, as required by the Medical Malpractice Act and specifically by Ark. Code Ann. § 16-114-206(a)(1) (1987). Dr. Epstein testified that he was an emergency medicine physician from Panama City, Florida. His curriculum vitae confirmed that he was a highly qualified physician.

Dr. Epstein testified that Panama City had a population of approximately 80,000 people. He further testified that in terms of the medical facilities available, Panama City was "very similar" to Hot Springs and that he was unaware of any facilities needed to detect possible child abuse that would have been available in Panama City but not available in Hot Springs. He added that he was familiar with the type of practice in which Dr.

Stecker was involved and had formulated an opinion about the standard of care. At that point, the Administrator requested Dr. Epstein's opinion on whether or not Dr. Stecker breached the standard of care.

Prior to the opinion being rendered, Dr. Stecker's attorney asked to *voir dire* the witness on his qualifications. Dr. Epstein admitted that he was an emergency room specialist rather than a family practitioner and that he did not practice family medicine. He added that the difference in the two specialties was that family practitioners have an on-going doctor/patient relationship and that that was usually not present in emergency room practice. He testified, nevertheless, that the standard of care for doctors in detecting and reporting child abuse would be the same for both emergency room physicians and family practitioners. Counsel for Dr. Stecker then objected to the admission of Dr. Epstein's opinion on the standard of care relating to diagnosis of child abuse on grounds of dissimilar practice and locality. The trial court conditionally granted Dr. Stecker's motion to exclude the expert testimony but allowed the Administrator to make a proffer of proof.

The Administrator first proffered the testimony of Dr. Stecker concerning the medical community in Hot Springs. Dr. Stecker, under questioning by the Administrator's counsel, testified that Hot Springs, a community with a population of approximately 35,000, had two acute and two subacute hospitals. One of the acute hospitals usually had an occupancy of about 120 beds, although it had a capacity of around 270. The other acute care hospital had a capacity of closer to 70 beds, although it had an average occupancy of about 60 patients. Dr. Stecker testified that although the hospitals were located in Hot Springs, both of the hospitals drew patients from throughout Garland County. She also testified that there were approximately 150 physicians in Hot Springs, eight or nine of whom were pediatricians. She added that the only equipment needed in the evaluation of Laura Fullbright was X-ray equipment and possibly a CT scanner, both of which were available to her. She further testified that the injuries that she encountered in her examination of Laura Fullbright were injuries that might be treated by an emergency room physician.

After Dr. Stecker's testimony, the Administrator recalled Dr. Epstein as part of his proffer. Dr. Epstein opined that based on the testimony of Dr. Stecker it was his opinion that Panama City was a comparable locality to Hot Springs. Dr. Epstein was then handed a Hot Springs telephone book and was asked if he could draw any conclusions about the makeup of the medical community based on the yellow pages. From that, he testified that the range of specialties and subspecialties available in Hot Springs was comparable to the range of specialties available in Panama City. He stated that the majority of patients that he encountered in the emergency room were not suffering from life-threatening injuries and that, although it was not intended for that purpose, the emergency room is used by some as a clinic. Therefore, in reality, he was able to know some of the patient's families and history as well as Dr. Stecker might in her family practice. He added that sometimes he saw patients as many as three times a month. He concluded by stating that his opinion on this case turned more on the history of the case and the physical examinations than on any technology that was or was not available to Dr. Stecker. A Hot Springs physician, he maintained, would apply the same standards in taking the history of the case and performing the physical examination that a Panama City physician would.

After the Administrator's proffer of Dr. Epstein's qualifications, the trial court made the following ruling on the admissibility of Dr. Epstein's opinion testimony:

> The one burdensome thing that concerns the Court is that you have a highly skilled expert, emergency room practice, has written numerous times, has a curriculum that's several pages. And here is a family practitioner. And I just hesitate to find that that highly skilled doctor would know what the standard is here in Hot Springs, Arkansas, or this locale. For that reason, I would exclude it.

Dr. Epstein then proffered his opinion that after reviewing the documentation, he believed Dr. Stecker failed to meet the standard of care by not reporting the suspected child abuse to investigating agencies on July 22, 1992.

The determination of an expert witness's qualification is within the discretion of the trial judge. *Goodwin* v. *Harrison*,

300 Ark. 474, 780 S.W.2d 518 (1989); *McElroy* v. *Benefield*, 299 Ark. 112, 771 S.W.2d 274 (1989); *Phillips* v. *Clark*, 297 Ark. 16, 759 S.W.2d 207 (1988). However, this discretion is not absolute, and this court will reverse, if the trial court abuses its discretion. *Thomas* v. *Sessions*, 307 Ark. 203, 818 S.W.2d 940 (1991).

### a. Different Specialty

In *Cathey* v. *Williams*, 290 Ark. 189, 718 S.W.2d 98 (1986), this court expressed its agreement with the reasoning of *Evans* v. *Ohanesian*, 38 Cal. App. 3d 125, 112 Cal. Rptr. 236 (1974), in which the California court stated:

> Nor is it critical whether a medical expert is a general practitioner or a specialist so long as he exhibits knowledge of the subject. Where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based on education, experience, observation or association with that specialty, his opinion is competent. [Citation.] The reason for not requiring specialization in a certified field is obvious. Physicians are reluctant to testify against each other. [Citations.] Consequently, when an expert can be found, it is immaterial whether he is a general practitioner or a specialist providing he has knowledge of the standard of care in any given field; otherwise, the plaintiff could never prove a case against a specialist unless he has an expert of the particular specialty, and the plaintiff would never be able to sue a general practitioner unless he had a general practitioner who was willing to testify as an expert. [Citation.]

290 Ark. at 192-193, 718 S.W.2d at 101. We then went forward and rendered this holding:

> We do hold that when the particular issue relates to a question within the general practitioner's own area of expertise, he is not prohibited by the malpractice statute from testifying upon that question as an expert.

290 Ark. at 194, 718 S.W.2d at 101.

In the instant case, Dr. Epstein testified that the standard of care for doctors in detecting and reporting child abuse would be the same for emergency room physicians and family practitioners and that no specialized technology available only to an emergency room physician was necessary for these evaluations. Indeed, Dr. Stecker agreed that she had the necessary equipment on hand to detect child abuse. But she contended that Dr. Epstein's emergency room practice and expertise made him unsuitable to testify about the standard of care for a family practitioner without emergency room expertise.

We disagree. What Dr. Epstein seemed to be asserting is that the knowledge necessary to evaluate a potential child abuse situation is one that is basic to the science of medicine and is the same regardless of whether the physician had a family medicine practice or an emergency room practice.

In this case, he based his opinion on the series of visits which Laura and her mother made to Dr. Stecker's office in June and July of 1992 and the doctors' notes and records respecting each visit. Had only one visit been made with signs of neglect or abuse, Dr. Stecker's argument about dissimilar practices and knowledge of the family might have more merit. But here, in light of the pattern of visits [June 12, 1992 (broken arm); July 9, 1992 (wobbly demeanor); July 21, 1992 (swollen right temple and right eye); and July 22, 1992 (both eyes swollen and bruised)], and the medical records available, we see no reason why Dr. Epstein's opinion would not be apposite. We are further persuaded that under these circumstances the variances in practices would not be a pivotal factor in diagnosing child abuse. *See Cathey* v. *Williams, supra.*

### b. Similar Locality

Nor do we view Panama City, Florida as sufficiently dissimilar to Hot Springs to disqualify Dr. Epstein from testifying about child abuse. This court has addressed the similar locality rule in several cases. In *Gambill* v. *Stroud*, 258 Ark. 766, 531 S.W.2d 945 (1975), we wrote:

> The rule we have established is not a strict locality rule. It incorporates the similar community into the picture. The standard is not limited to that of a particular locality.

Rather it is that of persons engaged in a similar practice in similar localities, giving consideration to geographical location, size and character of the community. The similarity of communities should depend not on population or area in a medical malpractice case, but rather upon their similarity from the standpoint of medical facilities, practices and advantages. For example, appellants state in their brief that it was uncontroverted that the medical standards of practice in Jonesboro, Little Rock, and Memphis are comparable. Thus, they could be considered similar localities.

258 Ark. at 770, 531 S.W.2d at 948-949. (Citations omitted.)

■ An expert witness need not be one who has practiced in the particular locality, or one who is intimately familiar with the practice in it in order to be qualified as an expert in a medical malpractice action, "if an appropriate foundation is established to demonstrate that the witness is familiar with the standard of practice in a similar locality, either by his testimony or by other evidence showing the similarity of localities." *White* v. *Mitchell*, 263 Ark. 787, 568 S.W.2d 216 (1978). Conclusory statements that the physician is so familiar are not enough. *See Grice* v. *Atkinson*, 308 Ark. 637, 826 S.W.2d 810 (1992). But that is not the situation in the case before us.

Here, unlike *Grice* v. *Atkinson, supra*, the trial court was provided evidence of similar localities through the testimony of Dr. Stecker and Dr. Epstein. There is, too, the irresistible suggestion that whether child abuse was evident is a question that spans localities irrespective of size and available technology. We further do not believe that by being called to proffer testimony about practice in Hot Springs Dr. Stecker was forced to be an expert against herself as contemplated by Ark. Code Ann. § 16-114-207(3) (1987).

■ In light of the above, we conclude that the trial court abused its discretion in excluding the medical expert testimony of Dr. Epstein. We reverse and remand the matter for a new trial solely for the claim made under the Medical Malpractice Act.

We next address whether a remand of the medical malpractice claim for trial would be a futile and useless act. *See Alexan-*

*der* v. *Twin City Bank*, 322 Ark. 478, 910 S.W.2d 196 (1995). Dr. Stecker contends that it would be since there is no cause of action for medical negligence for failure to report child abuse and, secondly, since there is no proof that the failure to report caused the death of Laura more than 1 1/2 months later. In essence, Dr. Stecker contends that the absence of a cause of action for medical negligence is another reason to affirm the directed verdict by the trial court.

Dr. Stecker cites us to *Cechman* v. *Travis*, 202 Ga. App. 255, 414 S.E.2d 282 (1992), for the proposition that a medical negligence claim does not lie under these facts. In *Cechman*, the doctor of a child later killed by an abusive father failed to report suspected child abuse after one examination in the emergency room. The Georgia Court of Appeals affirmed a grant of summary judgment in part because common law medical negligence did not impose a legal duty to discover and report a case of possible child abuse.

The scope of medical injuries giving rise to potential negligence claims in Arkansas, however, is apparently much broader than that in Georgia. "Medical Injury" is defined under the Medical Malpractice Act as "any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services; . . . or from failure to diagnose, . . . or otherwise arising out of or sustained in the course of such services." Ark. Code Ann. § 16-114-201(3) (1987). We conclude that this broad language encompasses a cause of action for failure to diagnose child abuse under the facts of this case. Moreover, counsel for Dr. Stecker conceded at oral argument that a child's death the day after suspected child abuse might be actionable as medical malpractice. We believe that the trial court appropriately refused to enter summary judgment in favor of Dr. Stecker on this point.

There is, then, the question of causation. Dr. Stecker points to the absence of a causative relationship as still another reason to affirm the directed verdict. But causation is ordinarily a fact question for the jury to decide. *See Catlett* v. *Stewart*, 304 Ark. 637, 804 S.W.2d 699 (1991). Here, Doug Shuffield, the brother of Robbins and an investigator for the Department of

Human Services, testified for the Administrator. He stated that had Dr. Stecker voiced suspicion to his agency of child abuse involving Laura, he would have recommended that an investigation be commenced. Though he believed that the complaint would have ultimately been deemed "unfounded," he acknowledged that in some instances knowing someone is going to be investigated might offer protection against abuse. He agreed that it might cause an abuser "to be more careful," and "mind their manners from the standpoint of abuse."

This stands to reason. Reporting child abuse would lead to an investigation which could result in some prophylactic action after the State entered the picture. In this case, Laura's father, Jim Fullbright, might have been alerted to take some legal action. The failure to report, however, allows the matter to fester unabated. We conclude that a fact issue for the jury exists in this case on whether the failure to diagnose and report was a partial cause of the death of Laura Fullbright.

## II. Directed Verdict

The Administrator also contends that the trial court erred in not directing a verdict in its favor on the count of failure to report reasonably suspected child abuse under § 12-12-507. According to the Administrator's contention, Dr. Stecker admitted that she suspected child abuse but did nothing about it. As a result, the Administrator urges that a directed verdict on this point was appropriate. We disagree. There is no doubt that Dr. Stecker had suspicions but the question is whether she had *reasonable* cause to suspect abuse. That was an issue for resolution by the jury, and the jury resolved the issue in favor of Dr. Stecker.

Furthermore, we have made it clear that we are extremely reluctant to affirm a directed verdict on behalf of a plaintiff. *Young* v. *Johnson*, 311 Ark. 551, 845 S.W.2d 510 (1993). In *Young* we quoted with approval from *United States Fire Ins. Co.* v. *Milner Hotels*, 253 F.2d 542, 547 (8th Cir. 1958):

> Thus, no matter how strong the evidence of a party, who has the burden of establishing negligence and proximate cause as facts, may comparatively seem to be, he is

not entitled to have those facts declared to have reality as a matter of law, unless there is utterly no rational basis in the situation, testimonially, circumstantially, or inferentially, for a jury to believe otherwise.

311 Ark. at 555, 845 S.W.2d at 512; *see also Potlatch Corp.* v. *Missouri Pacific R.R. Co.*, 321 Ark. 314, 902 S.W.2d 217 (1995). That test is not met in this case, and the trial court committed no error in denying the Administrator's motion for a directed verdict.

■ We will not entertain Dr. Stecker's cross-appeal on the "willful" component of the child abuse reporting statute because Dr. Stecker prevailed on that claim. *See Walker* v. *Kazi*, 316 Ark. 616, 875 S.W.2d 47 (1994).

Affirmed in part. Reversed and remanded in part.

GLAZE, J., concurs.

CORBIN, J. dissents.

TOM GLAZE, Justice, concurring. This case is one of first impression under our child abuse reporting statutes, but unfortunately, was not presented to this court in such a way to establish legal precedent under those statutes. I write only to emphasize certain points not discussed in the majority opinion.

Our child abuse reporting statutes are found at Ark. Code Ann. §§ 12-12-501—518 (Repl. 1995), and among other reasons, were enacted to protect the best interest of the child and to prevent further harm to the child. § 12-12-501. Under § 12-12-507(b), any physician, dentist, medical personnel, teacher, day care worker, *inter alios*, having *"reasonable cause to suspect* that a child has been subjected to child maltreatment . . . *shall immediately notify* central intake or law enforcement." (Emphasis added.) The statute places a duty on those who are most likely to observe and examine the child, and who are in positions of trust of the child's welfare. Additionally, § 12-12-507(c) provides that "[n]o privilege or contract shall relieve anyone required by the subchapter to make notification of the requirement of making notification." Thus, under our statutory scheme, a physician has an absolute duty to report to authorities when the physician has a reasonable suspicion that child abuse has

occurred, and the physician cannot claim a doctor-patient privilege in order to avoid the statute's reporting requirements.

In the present case, Dr. Rheeta Stecker admitted she suspected Laura's injuries were due to child abuse beginning with Laura's broken arm; nonetheless, she made a conscious decision not to report those suspicions. The standard of care is what a physician in Stecker's position should have reasonably suspected.[1] The burden was on the estate to show that Stecker breached that standard of care, and at what point in time, she had an absolute duty to report her suspicions. While Dr. Epstein testified, in his opinion, Stecker breached her duty to report on July 22, the jury never heard this testimony. As the majority opinion holds, we are reversing because of the exclusion of Epstein's testimony as to the medical malpractice cause of action. However, the estate did not properly preserve reversal as to the issue of violation of the child abuse reporting statutes. Without Epstein's excluded testimony, there is no evidence to show Stecker breached her duty under the reporting statutes. This court cannot reverse a trial court for denying a directed verdict based on evidence never presented to the trier of fact.

Finally, I note that while Stecker contended on appeal that her failure to report was not the proximate cause of Laura's death, nothing in the statute requires that failure to report child abuse result in the child's death. Under section 12-12-504(b), any person, official, or institution required to make notification of suspected child maltreatment who willfully fails to do so shall be civilly liable for damages proximately caused by that failure.

Because the estate filed its complaint against Stecker for damages under two different causes of action, medical malpractice and violation of the child abuse reporting statutes, it was necessary to show Stecker breached both standards of care. The estate failed to meet its burden under the reporting statutes.

DONALD L. CORBIN, Justice, dissenting. The majority does no more than substitute its independent thinking for that of the trial judge on the issue of the admissibility of Dr. Epstein's proffered expert testimony on the standard of care for diagnosing

---

[1] I note there is no locality rule under the child abuse reporting statutes.

child abuse in Hot Springs. In so doing, the majority fails to apply the abuse-of-discretion standard by which we are required to review the trial court's ruling in this matter.

An expert witness's qualifications are a matter lying within the trial court's discretion, and, absent an abuse of discretion, will be upheld on appeal. *Brumley* v. *Naples*, 320 Ark. 310, 896 S.W.2d 860 (1995); *Goodwin* v. *Harrison*, 300 Ark. 474, 780 S.W.2d 518 (1989). We have stated that manifest abuse of discretion means " 'a discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration.' " *Nazarenko* v. *CTI Trucking Co., Inc.*, 313 Ark. 570, 582, 856 S.W.2d 869, 875 (1993) (quoting *Security Ins. Co.* v. *Owen*, 255 Ark. 526, 501 S.W.2d 229 (1973)). Applying that definition to the facts of the present case, I cannot agree that the trial court abused its discretion in excluding Dr. Epstein's testimony.

To sustain its medical-malpractice claim, appellant was required to prove "[t]he degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, *engaged in the same type of practice or specialty in the locality in which he practices, or in a similar locality*[.]" Ark. Code Ann. § 16-114-206 (1987) (emphasis added). Applying this standard, the trial court determined that Dr. Epstein was not qualified to offer expert testimony on the issue of the standard of care for diagnosing child abuse in Hot Springs. I find no abuse of discretion.

As regards the differences in the medical specialties of Dr. Epstein and Dr. Stecker, Dr. Epstein's testimony and curriculum vitae confirm that he is a highly-qualified emergency-medicine physician. Dr. Epstein testified that he is an emergency-medicine specialist rather than a family practitioner, and does not maintain an independent office outside the hospital where he practices. Dr. Epstein conceded on *voir dire* that the types of medical problems he deals with, as an emergency-medicine physician, are different from those of a family practitioner. This statement may be confirmed by an examination of Dr. Epstein's vitae revealing his publications on the subjects of brain injury, transfusions, and spinal cord neoplasms, to name a few. Dr. Epstein stated that it is not the intention of the hospital where he practices to have the on-going doctor-patient relation-

ships that a family practitioner has, or to have parents bring in their child for a well-baby checkup. Dr. Epstein testified that the daily reality of practice for emergency-medicine practitioners is to treat people who do not have ordinary financial access to care and are in the emergency departments as a last resort. Dr. Stecker testified that the circumstances under which emergency-room doctors in Hot Springs usually see their patients differs from the circumstances for a family physician.

As regards the differences in the localities in which they practice, testimony was given by Dr. Epstein and Dr. Stecker regarding the medical facilities and technology in their respective localities, Panama City, Florida, and Hot Springs. Dr. Epstein estimated the population of Panama City is 80,000. Dr. Stecker estimated the population of Hot Springs is 35,000.

On this record, the trial court ruled that Dr. Epstein's proffered testimony on the standard of care for diagnosing child abuse in Hot Springs was inadmissible. I do not find that the trial court's decision was made with a discretion improvidently or thoughtlessly exercised and without due consideration. *Nazarenko*, 313 Ark. 570, 856 S.W.2d 869. For these reasons, I respectfully dissent.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
### MARCH 18, 1996

917 S.W.2d 167

*D. Scott Hickam,* for appellee Mary Ellen Robbins.

ROBERT L. BROWN, Justice. Appellee Mary Ellen Robbins has petitioned for rehearing to clarify that, upon remand of this case, the judgment discharging appellee Robbins with prejudice will not be disturbed. In its appeal of this case, appellant First Commercial Trust Company raised no issues and offered no argument directed at appellee Robbins. Because of this, appellee Robbins withdrew her cross-appeal. The opinion handed down in this case on February 12, 1996, was limited to the issues raised, and those issues pertained only to appellee Rheeta Stecker. Accordingly, the reversal and remand in this case relate solely to appellee Rheeta Stecker. The judgment entered in favor of appellee Mary Ellen Robbins in Garland County Circuit Court is affirmed.